589 So.2d 173 (1991)
Alfred Charles MOORE
v.
Benjamin REEVES, et al.
1900914.
Supreme Court of Alabama.
August 16, 1991.
Rehearing Denied October 4, 1991.
*174 Trey Riley, Huntsville, for appellant.
Danny D. Henderson and Wesley G. Smith of Spurrier, Rice & Henderson, Huntsville, for appellees.
HOUSTON, Justice.
Alfred Charles Moore appeals from a summary judgment entered in favor of the defendants, Benjamin Reeves, Robert Patterson, Geno D'Andrade, and James Patterson. We reverse and remand.
The summary judgment was proper in this case if there was no genuine issue of material fact and the defendants were entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. The burden was on the defendants to make a prima facie showing that no genuine issue of material fact existed and that they were entitled to a judgment as a matter of law. If that showing was made, then the burden shifted to the plaintiff to present evidence creating a genuine issue of material fact, so as to avoid entry of a judgment against him. In determining whether there was a genuine issue of material fact, this Court must view the evidence in the light most favorable to the plaintiff and resolve all reasonable doubts against the defendants. Wakefield v. State Farm Mutual Automobile Ins. Co., 572 So.2d 1220 (Ala.1990). Because this action was not pending on June 11, 1987, the applicable standard of review is the "substantial evidence" rule. Ala.Code 1975, § 12-21-12. "Substantial evidence" *175 is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); § 12-21-12.
The evidence, viewed in the light most favorable to Moore, as required under the applicable standard of review, reveals the following:
At the time of the accident made the basis of this appeal, Moore, who was 70 years old, was employed as a security guard or security officer by Oakwood Seventh Day Adventist Church School System, Inc., a corporation, doing business as Oakwood College ("the college"), in Huntsville, Alabama. As part of his duties, Moore patrolled the campus at the college. Defendant James Patterson was a sergeant with the security department at the college and was Moore's immediate supervisor; he was responsible for maintaining and repairing the vehicles in the security department. Defendant D'Andrade was the safety director at the college, and he had assigned the responsibility for maintaining and repairing the vehicles in the security department to James Patterson. D'Andrade reported to and answered to defendant Robert Patterson, who was vice-president of finance of the college. Defendant Reeves was the president of the college.
On the date of the accident, when Moore arrived for his shift, he was informed that his normal patrol vehicle needed repair and was not usable; therefore, James Patterson gave Moore the keys to a 1976 Plymouth station wagon and instructed him to use that vehicle to patrol the campus.[1] Moore previously had refused to drive the 1976 Plymouth, because, he said, it was "junk"; it was, according to Moore, in a state of disrepair. Specifically, the driver's door of the 1976 Plymouth would come open, if it were not closed securely and locked, so that the driver had to hold the door in order to keep it from opening. D'Andrade and James Patterson were aware that the door and the door closure mechanism of the 1976 Plymouth did not function properly; they had been aware of this problem for several months prior to the accident, but had not repaired the door. D'Andrade had issued an order precluding the use of the 1976 Plymouth on patrol duty and directly instructing James Patterson to inform Moore not to use that vehicle, because it was "unsafe"that is, the door "went bad." James Patterson had indicated that at the time of Moore's accident, "because it was not the best vehicle, [it was] used ... for stake-outs, just for parking, surveillance." Although this problem had existed for several months prior to the accident, on the day of Moore's accident, at the insistence of James Patterson and after having registered a complaint regarding its safety, Moore used the 1976 Plymouth to patrol the campus. Because the door would not close properly, Moore drove the 1976 Plymouth while holding the door shut with his elbow on the outside. As he was rounding a curve, the door came open; he fell out; as he fell out, his foot became caught between the accelerator and the brake pedal; and he was dragged along by the vehicle until it crashed into a tree. As a result, Moore sustained injuries to his back.
Moore sued the defendants under Ala. Code 1975, § 25-5-11(c)(2) (a provision of the Alabama Workmen's Compensation Act), alleging that the injuries he sustained from the accident resulted from the inoperable condition of a safety guard or device upon the vehicle he was drivingthat the mechanism designed and installed by the manufacturer of the vehicle to keep the door closed while the vehicle was being operated, thus keeping passengers inside the vehicle during its operation, was inoperable for a significant time preceding the accident made the basis of this suit.
We note that this case appears to be conceptually different from the majority of workmen's compensation cases filed pursuant *176 to § 25-5-11(c)(2), which involve a safety guard or device on a machine in a factory-type, industrial setting, such as Harris v. Gill, 585 So.2d 831 (Ala.1991) (a case in which an employee sued his supervisory co-employees for "bypassing" palm control buttons on a punch press designed to cut metal collars, which buttons were intended as a safety device or safety guard to protect the employee from injury). See, also, Bailey v. Hogg, 547 So.2d 498 (Ala. 1989), and Williams v. Price, 564 So.2d 408 (Ala. 1990). In this case, Moore, as the employee, sued the defendants, as his co-employees, for failing to maintain and/or repair the door and door closure mechanism on the vehicle he had to operate in order to patrol the campus, which was the job for which he was employed. Although not involving the more common machine in the more common industrial setting, the facts of this case nonetheless support an action under § 25-5-11(c)(2).
Section 25-5-11(c)(2) reads as follows:
"(c) As used herein, `willful conduct' means:
". . . .
"(2) The willful and intentional removal from a machine of a safety guard or device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from such removal; provided, however, removal of such a guard or device shall not be willful conduct unless such removal did, in fact, increase the danger of the use of the machine and was not done for the purpose of the repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
In Creel v. Bridewell, 535 So.2d 95, 97 (Ala.1988), this Court held that "[a] duty to provide co-employees with a safe workplace naturally encompasses a duty to provide co-employees with machines that function properly and safely." Thus, pursuant to the provisions of § 25-5-11(c)(2) and based on the well-settled law in Alabama, it was incumbent upon Moore to present substantial evidence that the defendants willfully and intentionally removed from the machine the safety guard or device provided by the manufacturer of the machine with knowledge that injury would likely or probably result from the removal. See Harris v. Gill, supra.
Moore contends that the willful and intentional failure to maintain or repair a safety guard or device that renders the guard or device inoperable or ineffective, is the equivalent of the "removal" of or the "failure to install" a safety guard or device within the purview of § 25-5-11(c)(2). Moore contends that the door and door closure mechanism of the 1976 Plymouth he was driving was as ineffective at keeping him inside the vehicle as if it had been removed; that the undisputed evidence establishes that his injuries resulted from the inoperable condition of that vehicle, because the door and door closure mechanism did not operate properly; and that that condition had existed for some time prior to his accident. He further contends that he presented substantial evidence that he was instructed to use the 1976 Plymouth in spite of its dangerous condition, with full knowledge on the part of the defendants that the vehicle was unsafe to operate and that operating it would result in injury.
The defendants contend that Moore failed to make out a prima facie case under § 25-5-11(c)(2). According to the defendants, this case does not even involve a safety guard or device as specified in § 25-5-11(c)(2). They contend that to hold that a door and door closure mechanism of a vehicle is a safety guard or device would implicitly extend the definition of those two terms "to encompass every aspect of a piece of machinery, which, in case of its malfunction, could result in an injury to an employee" and, therefore, "would result in a proliferation of co-employee suits." They also contend that Moore failed to present any evidence that the defendants, in allowing the door and door closure mechanism to remain unrepaired, knew that injury or death would likely or probably result.
Thus, ever mindful of, and consistent with, the well-established law that the Alabama *177 Workmen's Compensation Act is to be construed liberally to effect its beneficent purposes, resolving all reasonable doubts in favor of the claimant, Riley v. Perkins, 282 Ala. 629, 213 So.2d 796 (1968); Tiger Motor Co. v. Winslett, 278 Ala. 108, 176 So.2d 39 (1965), we must first determine, under the facts of this case, whether the door and door closure mechanism of a particular vehicle is a safety guard or device within the purview of § 25-5-11(c)(2).
The defendants contend that the terms "safety device" and "safety guard" refer to equipment installed on a machine for the primary purpose of guarding against a dangerous aspect of the machine and that a door and door closure mechanism of a vehicle does not qualify.
Moore contends that the door and door closure mechanism does qualify as a safety guard or device, because it was perfected to keep the door secure during the operation of the vehicle in order to protect the occupants of the vehicle from injury.
The legislature did not define the terms "safety device" and "safety guard"; there are no Alabama cases directly on point; and a careful research of other jurisdictions revealed nothing definitive. Therefore, for purposes of this appeal, noting that these terms are of general significance, and that their application is to be ascertained from the particular machine in controversy and the nature of the peril involved, we have undertaken to define the terms "safety device" and "safety guard" for purposes of § 25-5-11(c)(2).
"Device" is defined as "[an] invention or contrivance; any result of design," Black's Law Dictionary 452 (6th ed.1990); "something devised or constructed for a particular purpose," The American Heritage Dictionary of the English Language 361 (1969); "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function," Webster's New Collegiate Dictionary 309 (1981).
"Guard" is defined as "any device or apparatus that prevents injury, damage, or loss; an attachment or covering put on a machine to protect the operator," The American Heritage Dictionary of the English Language 584 (1969); "a protective or safety device; specif: a device for protecting a machine part or the operator of a machine," Webster's New Collegiate Dictionary 505 (1981).
"Safety" is defined as "contributing to or insuring safety; protective," The American Heritage Dictionary of the English Language 1142 (1969).
Thus, combining the above definitions of the above terms"device," "guard," and "safety"we conclude that the terms "safety device" and "safety guard" mean an invention or contrivance intended to protect against injury, damage, or loss that insures or gives security that an accident will be prevented. Therefore, for purposes of construing these terms within § 25-5-11(c)(2), we hold that a "safety device" or "safety guard" is that which is provided, principally, but not exclusively, as protection to an employee, which provides some shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer: it is not something that is a component part of the machine whose principal purpose is to facilitate or expedite the work.
Applying the above to the facts of this case (wherein the machine was the vehicle Moore was driving to patrol the campus, and the peril was the set of circumstances that caused Moore to sustain injuries), we hold that the door and door closure mechanism of the vehicle in which Moore was driving constituted a safety device or safety guard; it constituted a shield between Moore and danger so as to protect him from the injuries he sustained while he was patrolling the campus in performance of the services required of him by the college.[2]
The issue now becomes whether the failure to repair and/or maintain a safety *178 guard or device constitutes "removal" within the purview of § 25-5-11(c)(2).
In Bailey v. Hogg, 547 So.2d 498, 500 (Ala.1989)[3], this Court emphasized the important public policy of promoting safety in the workplace and the importance of safety guards and safety devices in promoting that public policy:
"The same dangers are present when an available safety guard is not installed as are present when the same guard has been removed. To say that an injury resulting from the willful and intentional removal of a safety guard is actionable but that an injury resulting from the willful and intentional failure to install the same guard is not contravenes that important public policy. To hold that the willful and intentional failure to install an available safety guard is not actionable would allow supervisory employees to oversee assembly of new machinery, instruct their employees not to install the safety guards, and then, when an employee is injured due to the lack of a safety guard, claim immunity from suit."
See, Williams v. Price, supra (a case in which this Court refused to extend the concept of "removal" under § 25-5-11(c)(2) to include instructions pertaining to safety procedures, whether given or not given). See, also, Harris v. Gill, supra (a case in which we held that the act of "bypassing" a safety device of a particular machine that would prevent an injury was encompassed within the word "removal").
The defendants contend that, even if the door and door closure mechanism constituted a safety guard or device under the facts of this case, that safety guard or device had not been removed, but was simply operating ineffectuallythat, at most, the defendants failed to correct a situation that was possibly unsafe. They contend that the act of failing to repair and/or maintain the door and door closure mechanism does not establish a prima facie case of willful conduct as defined in § 25-5-11(c)(2). Rather, they contend that, in order to establish such willful conduct, there must be a "removal" of a safety guard or device, or its equivalent, "the failure to install" a safety guard or device. See, Bailey v. Hogg, supra; Williams v. Price, supra; and Harris v. Gill, supra.
Moore contends that just as this Court recognized in Bailey v. Hogg, supra, that the same danger existed to an employee when an available safety guard or device was not installed as when it was removed that in either case, because the safety guard or device was rendered ineffective, public policy indicated by the legislature dictates that such conduct is actionable under the facts in this case, this Court should recognize and hold that the willful and intentional failure to maintain and/or repair a "safety guard" or "safety device," thereby rendering it inoperable, is as dangerous as the "removal" or "failure to install" that safety guard or device. In other words, Moore contends that the safety guard or device provided by the manufacturer (in this case, the safety guard or device was the door and door closure mechanism on the vehicle he was driving) was just as ineffective in keeping him inside the machine that he operated (in this case, the machine was the vehicle he drove to patrol the campus) as if it had been removed.
In light of the facts before this Court, having read and reread those cases brought under § 25-5-11(c)(2); having considered the rationale of this Court's holdings in those cases; having considered the legislative purposes in enacting the Workmen's Compensation Act, specifically its intent in providing employees a cause of action for the willful conduct of co-employees in the workplace, we hold that the failure to maintain and/or repair a safety guard or device provided by the manufacturer of a particular machine would be tantamount to the "removal of" or the "failure to install" a safety guard or device. To hold otherwise would allow supervisory employees to neglect the maintenance and repair of safety *179 equipment provided to protect co-employees from injury, which by its very nature is a clear violation of public policy.
Based on the foregoing, after reviewing the record in the light most favorable to Moore and resolving all reasonable doubts in his favor, we hold that the trial court erroneously entered the summary judgment in favor of the defendants on Moore's claim under § 25-5-11(c)(2). Therefore, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
MADDOX and STEAGALL, JJ., dissent.
MADDOX, Justice (dissenting).
When this Court decided Reed v. Brunson, 527 So.2d 102 (Ala.1988), I thought that the question of when and under what circumstances a workman could sue a co-employee had been laid to rest.
Today, the majority, by holding that a door locking mechanism on an automobile is a "safety guard or device" within the meaning of § 25-5-11(c)(2), reopens the debate, and, under the cloak of statutory construction, interprets the statute to apply to factual settings obviously not intended by our legislature. The holding today implicitly extends the definition of the term "safety guard or device" so that it conceivably encompasses every aspect of a piece of machinery that, in case of malfunction, could result in an injury to an employee, and thereby gives rise to a third-party lawsuit such as this one.
I believe that the majority applies the wrong rule of statutory construction to the statute and reaches a result not contemplated or intended by the lawmakers. I cannot accept the majority's conclusion that the failure of the workman's employer to repair a car door locking mechanism constituted a "willful and intentional removal from a machine of a safety guard or device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from such removal," so as to authorize the maintenance of a third-party action against co-employees for "willful conduct," as defined in Ala.Code 1975, § 25-5-11(c)(2). Consequently, I must respectfully dissent.
The Court states that § 25-5-11(c)(2) should be "construed liberally to effect its beneficent purpose, which is to require industry to bear part of the burden of disability and death resulting from the hazards of industry." It may or may not be "beneficent" to authorize an injured employee to sue his or her co-employee; that is not the question. The question is whether the legislature has permitted such a suit under the facts of this case.
It seems obvious to me that the legislature never intended such an interpretation to be made of this statute. In fact, the history of co-employee suits in this State shows that the legislature has repeatedly attempted to limit co-employee suits, not beneficently provide for them.[4] In applying *180 this rule of statutory construction to this statute, the Court seems to ignore the fact that the legislature, for almost two decades, had been attempting to prohibit co-employee lawsuits, and, rightly or wrongly, the legislature clearly has not considered such suits to be "beneficent," but a "social evil."[5]
Although it is clear that the legislature authorized some co-employee lawsuits, it is equally plain that it did not intend to authorize one involving facts such as are presented here.
Although noting that this case is "conceptually different from the majority of workmen's compensation cases ... which involve a safety guard or device on a machine in a factory-type, industrial setting," and although "not involving the more common machine in the more common industrial setting," the majority nevertheless holds specifically that "for purposes of construing these terms within § 25-5-11(c)(2) ... a `safety device' or `safety guard' is that which is provided, principally, but not exclusively, as protection to an employee, which provides some shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer: it is not something that is a component part of the machine whose principal purpose is to facilitate or expedite the work."
The majority seems to recognize that, under a fair reading, the words of the statute[6] do not encompass a third-party suit under these facts, and the majority fails to explain why the failure to repair a car door is "willful conduct" in this case, and the removal of guards, albeit not from the injury-producing "nip point," was not *181 "willful conduct" in Reed v. Brunson.[7]
By interpreting the statute as not barring this action under the facts of this case, I think that the majority takes what the legislature intended as a very narrow exception to co-employee immunity, and expands it so that the exception will swallow up the rule and, rightly or wrongly, the intent of the legislature, as expressed in Section 1 of the very Act this case construes, will have been completely ignored and disregarded.
STEAGALL, J., concurs.
NOTES
[1] The undisputed evidence established that there was no safety belt provided in the station wagon.
[2] If the legislature intended a more restrictive definition of the terms "safety guard" or "safety device," it can enact appropriate legislation for this purpose.
[3] Although the author of this opinion dissented in the holding in Bailey v. Hogg, 547 So.2d 498 (Ala.1989), disagreeing with the rationale of the Court in its holding, that holding is the law; and the author is bound by stare decisis to follow that law and is bound to follow any rational and logical extension thereof.
[4] The history of co-employee lawsuits is well known, and such suits have received the attention of the legislature and this Court, especially in the last two decades. Insofar as I can tell, the question of the right of a co-employee to sue a fellow employee in a third-party action had not been considered until the question was presented to this Court for resolution in United States Fire Insurance Co. v. McCormick, 286 Ala. 531, 243 So.2d 367 (1970). In that case, by an opinion authored by Merrill, J., and joined by Lawson, Harwood, Maddox, and McCall, JJ., the Court held that the legislature had not specifically mandated that co-employees could not be sued in third-party actions. The legislature quickly reacted to this holding and passed legislation to immunize co-employees from such suits. Act 1062, Acts of Alabama 1973, at pages 1771-72. That immunizing legislation was promptly attacked as being unconstitutional on the ground that the act signed by the governor materially differed from the bill passed by the legislature. A divided Court held that the 1973 Act was valid and that the defendants were entitled to summary judgment because the "plaintiff's injuries resulted from an accident which arose out of and in the course of his employment, and that by virtue of Tit. 26, § 312 [Code of Alabama of 1940], co-employees are not third-party tortfeasors against whom an action such as this can be brought." Childers v. Couey, 348 So.2d 1349, 1352 (Ala.1977) (Embry, J., joined by Torbert, C.J., and Bloodworth and Faulkner, JJ., with Almon, J., concurring in the result; Shores, J., dissenting with opinion, in which Maddox, J., joined; Jones and Beatty, JJ., dissenting with opinions); also see, Atchison v. Horton, 348 So.2d 1358 (Ala.1977). The legislature, in 1975, amended § 312, Tit. 26 (which authorized the filing of third-party lawsuits), but continued to immunize co-employees from suit, as it had in the 1973 Act. See Act No. 86, 4th Ex.Sess. § 10, p. 2748, Acts of Alabama 1975. Even though the 1973 Act immunizing co-employees was upheld against the attack made upon it, an attack was made against the 1975 amendment in Grantham v. Denke, 359 So.2d 785 (Ala.1978), on the ground that the legislature could not immunize co-employees from third-party lawsuits because of the provisions of Section 13 of Alabama's Constitution. A majority of this Court (opinion by Embry, J., with whom Bloodworth, Faulkner, Jones, Almon, Shores, and Beatty, JJ., joined; Maddox, J., dissenting, with which Torbert, C.J., concurred) held that the immunizing legislation was unconstitutional as violating Section 13 of the Alabama Constitution.

In 1984, the legislature again amended what is now § 26-5-11 to provide for co-employee immunity, except when an injury resulted from "willful conduct." Ala. Acts 1984, 2d Ex.Sess., No. 85-41, p. 44, § 3. That amendment was the subject of an attack on the ground that Section 13 of our Constitution prohibited the legislature from granting co-employees immunity. See Reed v. Brunson, 527 So.2d 102 (Ala.1988), in which this Court upheld as constitutional the legislation now being construed.
[5] In Reed v. Brunson, the author of the majority opinion in this case said that "the Legislature does have the power to eliminate such co-employee suits in an attempt to eradicate or ameliorate what it perceives to be a social evil." (Emphasis added.) 527 So.2d at 116. In that case, this Court set out in its entirety Section 1 of the Act we construe today. 527 So.2d at 112-13. In its findings, the legislature specifically stated that co-employee lawsuits were "contrary to the intent of the legislature in adopting a comprehensive workers' compensation scheme and are producing a debilitating and adverse effect upon efforts to retain existing, and to attract new industry to the state." In view of the clear expression of legislative intent to the contrary, it is difficult to understand why the majority calls such lawsuits "beneficent."
[6] The office of interpretation is not to improve a statute, but to expound it; and courts look for legislative intent in the language of a statute; that language may be explained, but it cannot be detracted from or added to. Alabama Indus. Bank v. State ex rel. Avinger, 286 Ala. 59, 237 So.2d 108 (1970).

It seems to me that a fair reading and reasonable interpretation of the legislative definition of "willful conduct" contained in the Code requires several facts to be shown: (1) a removal; (2) of a safety guard or safety device provided by the manufacturer of the machine; (3) such removal being willful and intentional; and (4) with the knowledge that injury or death would likely or probably result from such removal. I personally cannot find any facts in this record to show that the workman here has shown such "willful conduct" on the part of these defendants.
[7] If the definition of "safety guard or device" that the Court adopts today had been used in Reed v. Brunson, it would appear that the plaintiff in Reed stated a claim for relief, because that case involved a concrete mixing machine and the plaintiff's injury was caused by an unguarded "nip point." In Reed, this Court said the following:

"The plaintiff argues, under § 25-5-11(c)(2), that the defendants willfully and intentionally removed a guard from the mixer that shielded the front of the drive wheel. As previously stated, there is evidence tending to show that such a guard had been removed from the mixer at some point prior to the plaintiff's injury. However, that guard did not shield the nip-point in which the plaintiff caught his hand. It appears undisputed in the record that at the time the mixer was installed at Faulkner Concrete Pipe Company, it was not equipped with side guards shielding the nip-point. Therefore, there is no evidence that the plaintiff's injury was proximately caused by the defendants' removal of a safety guard or device that had been provided by the manufacturer of the mixer."
527 So.2d at 120.